Sergio F. GROSSLING,

v.

FORD MEMORIAL HOSPITAL and James O. Dismukes.

No. TY–84–1–CA.

United States District Court, E.D. Texas, Tyler Division.

Aug. 1, 1985.

⇐═6

R.L. Whitehead, Jr., Whitehead-Beckworth, Longview, Tex., for plaintiff.

Wayne Pearson, Larry Hallman, Burford & Ryburn, Dallas, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEGER, District Judge.

On January 22, 1985, came on for trial before the Court the above-entitled and numbered cause. Having heard the evidence presented and having duly considered all testimony, exhibits and arguments, the Court now enters these Findings of Fact and Conclusions of Law in conformity with Fed.R.Civ.P. 52(a). Any finding of fact that constitutes a conclusion of law shall be deemed a conclusion of law. Any conclusion of law that constitutes a finding of fact shall be deemed a finding of fact.

## I. FINDINGS OF FACT

1. This action seeks monetary and injunctive relief under 42 U.S.C. § 1985 and under state law for a medical doctor who was dismissed from the staff of a private hospital.

2. At the time of the filing of this cause of action, Plaintiff was a resident of Gladewater, Gregg County, Texas, and is now a resident of Arlington, Tarrant County, Texas. Plaintiff was and is a duly licensed physician authorized to practice medicine under the laws of the State of Texas, and is a citizen of the State of Texas. Plaintiff was born on March 18, 1929 in Antofagasta, Chile, and became a citizen of the United States on December 15, 1971.

3. Defendant Ford Memorial Hospital is a private, nonprofit corporation organized under the laws of the State of Texas. Is governed by a Board of Trustees. Membership on the Board of Trustees is not a governmental position, nor are any of the trustees chosen by public officials.

4. Defendant James O. Dismukes is a citizen of the State of Texas. Starting in October of 1981 through all dates relevant to this action, he served as Executive Director of the Ford Memorial Hospital.

5. Dr. Grossling joined the staff at the Ford Memorial Hospital (hereafter referred to as "the hospital") in August of 1981. His primary responsibilities were those of a surgeon.

6. In early 1982, plaintiff and defendant Dismukes had an informal meeting to discuss various complaints concerning plaintiff's conduct at the hospital, particularly in surgery.

7. Later in 1982, plaintiff lost his temper and had a serious outburst in surgery. The medical staff issued a formal letter of admonition as a result.

8. In September of 1982, plaintiff was told that his services were no longer needed by the hospital after most of the doctors on the staff, including the chief of staff, Dr. H.P. Torres, had complained about plaintiff's behavior. This message was delivered by Mr. Dismukes, and left plaintiff convinced that Dismukes was "out to get his head."

9. In October of 1982, an ad hoc medical staff committee reviewed those surgical cases of Dr. Grossling that involved complications. On November 30, 1982, this committee found that Dr. Grossling's surgical competency was acceptable by current medical standards. *See* Plaintiff's Exhibit Nos. 1 and 2.

10. On December 1, 1982, the hospital's Board of Trustees met to consider complaints of harassment brought by plaintiff against defendant Dismukes. Plaintiff was invited to attend the meeting but did not do so. Mr. Dismukes refuted the charges and was backed by Dr. Torres.

The board voted unanimously to exonerate Mr. Dismukes. *See* Defendant's Exhibit No. 3.

11. On December 21, 1982, plaintiff offered to resign from the hospital's staff if statements concerning an alleged high infection rate among his patients were stricken from his record. No further action was taken on this offer. On December 27, 1982, plaintiff was reappointed to the medical staff, but this was done with reservations concerning plaintiff's purportedly disruptive behavior. *See* Plaintiff's Exhibit No. 3.

12. On January 21, 1983, Mr. Dismukes requested information from the director of the American College of Surgeons concerning plaintiff's competency. *See* Plaintiff's Exhibit No. 4. On April 28, 1983, the Board of Trustees established a special committee to review Dr. Grossling's professional conduct. *See* Defendant's Exhibit No. 4. Dr. Grossling was not informed of these actions when they were taken.

13. On May 6, 1983, the special committee met to determine the procedure for reviewing Dr. Grossling's conduct. Among other things, letters were sent to physicians outside the hospital's staff soliciting their assistance in evaluating plaintiff's competency. *See* Plaintiff's Exhibit No. 5.

14. The special committee met again on July 13, 1983, to review the information received. Based on that information, the committee voted to recommend plaintiff's permanent removal from the hospital's staff. *See* Plaintiff's Exhibit No. 6.

15. On July 20, 1983, the Board of Trustees accepted the special committee's recommendation and voted to terminate plaintiff's membership on the hospital's staff. Plaintiff was informed of the board's decision by a certified letter mailed on the same day. *See* Plaintiff's Exhibit No. 7. In accordance with the hospital's medical staff bylaws, Plaintiff requested a hearing before a special hearing committee to review the board's decision.

16. The review hearing was conducted on August 8, 1983. Plaintiff responded to the charges against him as they had been outlined in the letter notifying him of the hearing. The hearing committee voted unanimously to affirm the board's decision to terminate plaintiff's staff privileges. *See* Defendant's Exhibit No. 5.

17. The procedure employed by the special hearing committee was inconsistent with the requirements of the hospital's medical staff bylaws. In particular, no member of the medical staff was included on the committee (§ 4.2 of the bylaws), no representative of the governing body of the hospital presented appropriate evidence in support of the dismissal (§ 5.8), and plaintiff was effectively denied the right to challenge witnesses or rebut evidence against him (§ 5.9). *See* Plaintiff's Exhibit 16.

18. Dr. Grossling requested appellate review by the entire board of the special hearing committee's decision, and another hearing was scheduled for September 1, 1983. Copies of the information that formed the basis for the dismissal decision were finally sent to plaintiff on August 19, 1983.

19. The hospital's Board of Trustees met on September 1. Dr. Grossling brought a tape recorder and evidenced his intent to record the proceedings. The board's chairman refused to allow this, and Dr. Grossling left. The board subsequently finalized its decision to dismiss plaintiff. *See* Plaintiff's Exhibit No. 13.

20. Defendant Dismukes did not discriminate against plaintiff because of his national origin. Although one witness, Dr. John Delcambre, suggested that the fact that plaintiff graduated from a foreign medical school may have played a small role in causing the friction between Mr. Dismukes and Dr. Grossling, there was no overt evidence of this attitude. In fact, most of the hospital's medical staff at the time had graduated from foreign schools, and no problems involving those doctors were brought to light. The difficulties and resulting turmoil between Mr. Dismukes and Dr. Grossling were caused by their individual personality conflicts.

## II. DISCUSSION

Plaintiff's amended complaint seeks recovery based on two theories: First, the complaint alleges that Mr. Dismukes and the hospital conspired against plaintiff in violation of 42 U.S.C. § 1985(3). Second, the complaint alleges that the defendants treated plaintiff unfairly when they dismissed him from the hospital's staff, a violation of the laws of the State of Texas. Plaintiff has requested this Court to invoke its pendent jurisdiction over the latter claim. Both claims will be discussed separately.

### A. Conspiracy

■ In order to prevail on a claim based on 42 U.S.C. § 1985(3), the plaintiff must establish four things by a preponderance of the evidence:

(1) A conspiracy;

(2) For the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the law, or of equal privileges and immunities under the law; and

(3) An act in furtherance of the conspiracy;

(4) Whereby a person is either injured in his person or property or is deprived of some right, privilege or immunity accorded to citizens of the United States. *United Broth. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

In order to prevent § 1985(3) from being used in every instance where two or more people conspire to injure another, the Court has stressed the importance of the second element, which requires the existence of some invidious, class-based animus that motivates the conspiracy. *Scott,* 103 S.Ct. at 3359; *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798.

There is some question concerning the existence of a conspiracy in this case, and the litigants have spent a good deal of time briefing this issue. Defendants argue that all the parties involved acted as agents for the corporate hospital, meaning that only one party—the corporation—acted against the plaintiff. With only one party involved, no conspiracy is possible.

■ Even in an antitrust context, where corporate conspiracies are not recognized, it has been held that a medical staff is a combination of individuals capable of a conspiracy. *See Weiss v. York Hospital,* 745 F.2d 786, 814 (2d Cir.1984). To the extent that the medical staff at Ford Memorial Hospital involved themselves in the revocation of plaintiff's staff privileges, a conspiracy among them and the hospital, through its agents, may have existed. The only parties named in plaintiff's complaints, however, are the hospital and its executive director.

■ Plaintiff, therefore, has limited himself to an allegation of conspiracy between a corporate hospital's executive director and its governing board. According to the Supreme Court, there is a disagreement among the circuits on whether corporate employees can conspire with themselves or with the corporation in violation of § 1985(3). *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 2744 n. 24, 81 L.Ed.2d 628 (1984). The Third Circuit has held that under the proper circumstances, corporate employees can conspire among themselves. *See Novotny v. Great Am. Federal S. & L. Ass'n,* 584 F.2d 1235, 1259 (3rd Cir.1978) (en banc), *vacated and remanded on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). *Novotny* rejected the prevailing rule from the Seventh Circuit that there could be no intracorporate conspiracies for § 1985(3) purposes. *See Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir.1972) (Stevens, J.). At least one Fifth Circuit panel has indicated a preference for the *Novotny* approach. *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 603 (5th Cir.1981). Employing the reasoning of *Dussouy* and *Novotny,* plaintiff adequately alleged a conspiracy between defendant Dismukes and the hospital's governing board. *Novotny* left at least one major

question unanswered, however, for even if corporate agents can conspire amongst themselves and incur liability, it is unclear whether the corporation itself also incurs liability because of their actions. *See generally* Note, *Intracorporate Conspiracies Under 42 U.S.C. § 1985(c)*, 92 Harv.L.Rev. 470, 475 (1978). This question need not be answered in this case, and any remaining factual issues concerning intracorporate conspiracy need not be decided, since the plaintiff has in any event failed to satisfy two of the other essential elements of a § 1985(3) cause of action.

■ First, plaintiff has failed to prove that an invidious, class-based animus motivated the actions taken against him. Plaintiff alleged that the defendants conspired against him because of his Chilean ancestry and heritage. Yet no persuasive evidence was presented tending to support that allegation.

The evidence presented concerned only two incidents allegedly demonstrating some racial bias. On one occasion, Dr. Foster, a member of the medical staff at the hospital, allegedly referred to plaintiff as a "wetback." As noted earlier, however, the members of the medical staff were not named as parties to this action or the conspiracy, and this one comment does not support the conclusion that racial animosity spurred the conspiracy, if any, between Dismukes and the hospital board. Nor does this one comment suggest any ill will towards people of Chilean descent.

The only other evidence of a purported racial bias was a comment by Dismukes referring to plaintiff's "Latin temper." Again, this falls far short of proving the existence of a conspiracy motivated by hatred for Chileans, or even a hatred for anyone who might be described as being of Latin descent. The comment seemingly was motivated by plaintiff's alleged short temper, and not his national origin. From the evidence adduced at trial it seems that plaintiff had some personality traits, possibly including his temper, that led to many of his disputes with Dismukes. Even if this one comment, taken together with sub-

sequent actions, did demonstrate that Dismukes disliked plaintiff because of his race or national origin, there was absolutely no evidence offered to demonstrate a similar sentiment among the hospital's directors. Lacking this proof, it cannot be said that the conspiracy was rooted in racial prejudice, since one of the parties to the alleged conspiracy harbored no such ill will toward plaintiff.

In the face of the two incidents described above, numerous witnesses, including some called by plaintiff, supported the conclusion that racial discrimination did *not* instigate a conspiracy against plaintiff. Dr. Roger Whitman of the hospital's staff testified on cross-examination that he did not believe plaintiff's national origin was the cause of the actions taken against him. This same belief was affirmed by Gerald Johnson, formerly the administrator at Ford Memorial Hospital's Clinic, and Rebecca McClure, a registered nurse at the hospital at the time. Dr. John Delcambre of the hospital's staff testified that the problems between plaintiff and Dismukes arose out of personality conflicts rather than racial prejudice.

There was little evidence presented relating to plaintiff's competence as a surgeon, and it is unfortunate that this entire episode has become a blot on his career. His difficulties at Ford Memorial Hospital cannot be attributed to any racial prejudice, however, especially since at least five other doctors on the hospital's staff had ties to foreign countries and none suffered similar problems. While it may be somewhat trite, it is also true that many times people do not get along simply because their personalities clash. Based on the evidence presented at trial, this seems to be the likely explanation for the events that transpired at the Ford Memorial Hospital. While it may have been unpleasant, that is not enough to state a cause of action under § 1985(3).

■ A second reason remains that also banishes plaintiff's cause of action from the ranks of § 1985(3) conspiracies. The Supreme Court, in dicta, has endorsed the Seventh Circuit's view that § 1985(3) does

not provide substantial rights itself, but rather the rights sought to be vindicated must be found elsewhere. If the rights that are found require a component of state action for their infringement, such as the equal protection and due process claims in this case, then state action becomes a prerequisite to a successful § 1985(3) cause of action. *See Scott*, 103 S.Ct. at 3358; *citing Great American Fed. S. & L. Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979) ("... to make out their § 1985(3) case, it was necessary for respondents to prove that the state was somehow involved in or affected by the conspiracy.") *See also Dombrowski v. Dowling*, 459 F.2d 190, 194–95 (7th Cir.1972) (the first pronouncement of the occasional requirement for state action in § 1985(3) cases).

Plaintiff did not establish that the state was involved in or affected by the purported conspiracy in this case. Plaintiff admits that the defendant hospital is a private, non-profit corporation. Plaintiff has nevertheless attempted to devise some state involvement based on two factors: First, Ford Memorial Hospital, like all public and private hospitals today, received substantial funds from state and federal sources such as Medicare and Medicaid. Second, since Ford Memorial Hospital is the only medical facility in the area, it is quasi-public and, in plaintiff's opinion, a state actor.

 There are three ways these factors could be used to demonstrate that a facially private entity is really acting under color of state law. First, a plaintiff may show that there is a sufficiently close nexus between regulations imposed by a state and the challenged action of the regulated entity so that the action of the latter may fairly be attributed to the state. *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982), *citing Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Plaintiff has not attempted to find such a nexus in this case, other than the reference to governmental funds received by the hospital. No state regulation

imposed on the hospital directly led to the denial of plaintiff's staff privileges, however, and the existence of some governmental funding falls far short of establishing the required nexus.

 Second, a plaintiff may prove state action by showing that the state exercised coercive power or provided significant overt or covert encouragement to induce the challenged private action. *Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2786, *citing Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 166, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185 (1978). Mere approval of or acquiescence in the private activity is insufficient to prove state involvement. *Yaretsky*, 457 U.S. at 1004–05, 102 S.Ct. at 2785–86. Again, the only allegation by plaintiff that arguably relates to this method of proving state action is the reference to the governmental funds received by the hospital. The hospital's receipt of financial support, however, is insufficient to show state action standing alone. *See Herwald v. Schweiker*, 658 F.2d 359, 362 (5th Cir.1981) (nursing home not state actor); *Briscoe v. Bock*, 540 F.2d 392, 395–96 (8th Cir.1976) (no state action where private hospital dismissed a physician from its staff despite the fact that it received government funds and was subject to state regulation). In order to implicate the state, there must be some connection between the governmental contacts and the challenged action of the hospital. In effect, it is necessary to show that the regulations imposed or the funds received led to, or caused, plaintiff's dismissal from the hospital's staff. *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873, 879 (5th Cir.), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). There was nothing in this case to indicate such a causal relationship or other link between the governmental contacts and the challenged conduct. Neither state regulations nor governmental funding played any role in plaintiff's dismissal from the medical staff at the hospital.

 There is a third way to establish state involvement in cases involving private action. If the private entity exercises pow-

ers that are traditionally the exclusive prerogative of the state, the required nexus is present and the state action requirement is satisfied. *Yaretsky,* 457 U.S. at 1005, 102 S.Ct. at 2786. By arguing that the Ford Memorial Hospital is quasi-public since it is the only medical facility in the area, plaintiff in effect is arguing that it performs functions traditionally undertaken by the state. Many hospitals and medical facilities, if not most, are privately owned and operated. Plaintiff presented no evidence or authority supporting the proposition that the provision of medical care is a traditional, inherent function of the state. There is no doubt that government has become heavily involved in guaranteeing access to medical care, primarily through programs like Medicare and Medicaid. Government does not always provide the actual facilities or personnel, however. In that sense, the Ford Memorial Hospital is a privately owned enterprise "providing services that the State would not necessarily provide," and is not a state actor. *Yaretsky,* 457 U.S. at 1011, 102 S.Ct. at 2789; *Greco,* 513 F.2d at 881–82.

The government's involvement with this hospital is not related to its decision to dismiss plaintiff. For this reason, plaintiff has failed to satisfy the state action requirement of his § 1985(3) claim, and has therefore failed to establish a second essential element of that claim. Plaintiff's only remaining claim concerns his allegedly unfair treatment under state law.

### B. Unfair Treatment

In addition to his § 1985(3) conspiracy action, plaintiff also asserted a claim under state law alleging unfair treatment in the manner of his dismissal from the hospital's staff. Taking plaintiff's allegations to heart, the Court will strictly apply state law in deciding this issue.

In Texas, when a hospital discriminates against or dismisses a doctor seeking to retain his staff membership, the power of a court to intervene depends on whether the hospital is a public or private institution. *Tigua General Hospital v. Feuer-*

*berg,* 645 S.W.2d 575, 578 (Tex.App.—El Paso 1982, writ dism'd w.o.j.). Plaintiff has stipulated that the Ford Memorial Hospital is a private, non-profit corporation, and the preceding discussion concerning state action indicates that the state is in no other way implicated in the hospital's actions toward plaintiff. The Ford Memorial Hospital is therefore a private institution.

Under Texas law, a private hospital acts at its own discretion when deciding questions concerning staff membership, and its decisions are not subject to judicial review. *Feuerberg,* 645 S.W.2d at 578. The exclusion of a physician from a private hospital's staff is solely within the discretion of the hospital's management, and courts may not interfere. *Charter Medical Corp. v. Miller,* 605 S.W.2d 943 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r. e.); *Weary v. Baylor University Hospital,* 360 S.W.2d 895 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.). This rule does not provide an exception for cases such as the present one where the hospital's management did not strictly follow its own self-imposed procedures, especially since Texas courts have held that procedural due process is not required in these cases. *Charter Medical,* 605 S.W.2d at 951. This Court may not interfere with the hospital's decision.

Plaintiff attempted to carve one exception to the rule by relying on *Hodges v. Arlington Neuropsychiatric Center, Inc.,* 628 S.W.2d 536 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). In *Hodges,* the court referred to an argument advanced by the plaintiffs at trial alleging that the Arlington facility was quasi-public in nature, and therefore not entitled to the immunity afforded to private hospitals. The court noted that the quasi-public distinction came from New Jersey and California law, and lacked authority in Texas. The plaintiff correctly notes that the court did not reject the quasi-public argument, but it certainly did not accept it either. Instead, the court relied on *Charter Medical* and *Geary* to affirm the trial court's conclusion that the

plaintiff failed to state a cause of action. 628 S.W.2d at 538.

This Court is also unwilling to depart from the rule set out in *Charter Medical* and *Geary*. Just as in *Hodges,* this Court is also convinced that while the treatment plaintiff received from the hospital may have been unpleasant, it was not irrational or unreasonable. Under such circumstances, the quasi-public argument is unavailing.

## CONCLUSIONS OF LAW

Based on the preceding discussion, the Court has reached the following conclusions of law:

1. The Court has jurisdiction over the subject matter and parties involved in this action pursuant to 28 U.S.C. § 1331 and pendent claim jurisdiction. Venue is proper in this Court.

2. Plaintiff failed to prove two essential elements of his conspiracy cause of action under 42 U.S.C. § 1985(3). First, he failed to prove that the conspiracy against him, if any, was motivated by an invidious, racially-based animus. Second, he failed to prove sufficient state involvement as required when a § 1985(3) conspiracy claim is based on the deprivation of rights secured by the fourteenth amendment to the Constitution.

3. The defendant, Ford Memorial Hospital, is a private institution. Under the laws of the State of Texas, this Court is precluded from interfering in the decisions made by a private hospital's administrators regarding the denial of physician staff privileges. Even if the law of Texas was disregarded, and federal law applied in its stead, plaintiff failed to satisfy the state action requirement that would be imposed by that law.

4. Plaintiff Sergio F. Grossling is not entitled to any of the relief he requested.

5. All costs are to be borne by the respective parties.

## JUDGMENT

This action having come on for trial before the court, without a jury, and the issues having been tried and a decision having been duly rendered, the Court has this day entered its Findings of Fact and Conclusions of Law directing judgment for the reasons stated therein.

It is, therefore, ORDERED that defendants, Ford Memorial Hospital and James O. Dismukes, have judgment over and against plaintiff, Sergio F. Grossling, and that said plaintiff take nothing by virtue of his claims against defendants.

It is further ORDERED that all costs are to be borne by the respective parties. *See* Fed.R.Civ.P. 54(d).