Donald S. WINSTON, M.D., Donald S. Winston, M.D., P.A., and Galleria Medical Center, Inc., Appellants,

v.

AMERICAN MEDICAL INTERNATIONAL, INC., Twelve Oaks Hospital, Victorrino G. Cumagun, M.D., R. Andrew Jackson, M.D., Ronald F. Norris, M.D., and Norborne B. Powell, M.D., Appellees.

No. 01–91–01441–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 3, 1996.

Mike O'Brien, Houston, for Appellants.

Dan McClure, Daniel Hedges, Richard Zook, Houston, Ben Taylor, Dallas, for Appellees.

Before SAM H. BASS,* MIRABAL and WILSON, JJ.

## OPINION

SAM H. BASS, Justice (Assigned).

In the trial court, Donald S. Winston, M.D., Donald S. Winston, M.D., P.A., and Galleria Medical Center, Inc. (plaintiffs), sued American Medical International, Inc. (AMI), Twelve Oaks Hospital, and various doctors (defendants). Fundamentally, this is a dispute between doctors over two intertwined issues: (1) the business end of their medical practices; and (2) the denial of Dr. Winston's application for staff privileges. The trial judge granted defendants' joint motion for summary judgment, and plaintiffs appeal challenging the adverse ruling. We affirm in part, and reverse and remand in part.

### I. Undisputed Facts

In 1981, Dr. Winston opened an industrial medicine practice in the Galleria shopping mall known as Galleria Clinic, Inc., since renamed Galleria Medical Center, Inc. (GMC). In late 1981 and early 1982, and pursuant to the Hospital's by-laws, Dr. Winston applied [1] for, and then received, temporary staff privileges [2] at Twelve Oaks Hospital, a private hospital owned by Twelve Oaks Medical Center, Inc., corporate affiliate of AMI. During the time Dr. Winston held privileges, approximately 15 patients per month were referred from his Galleria office

---

* Justice BASS, who retired on May 31, 1993, continues to sit by assignment for the disposition of this case, which was submitted prior to that date.

1. The defendants describe Dr. Winston as having received temporary staff privileges while his application for permanent staff privileges was being considered. This application for permanent status was what was later denied and then withdrawn. Dr. Winston notes that he was not unknown to the Hospital when he filed the '81 application. While Dr. Winston was completing his medical residency, he received privileges beginning in April 1979 limited to the Department of Emergency Medicine.

2. The type of staff privileges sought by Dr. Winston would allow him to admit patients, provide care, and perform certain general types of medical and surgical procedures at the hospital.

to the Twelve Oaks Hospital for admission and/or treatment.

By letter dated November 4, 1982, Twelve Oaks notified Dr. Winston that the committee examining his application for permanent staff privileges would recommend to the Board of Directors that his request for staff privileges be denied, and that his temporary privileges were suspended pending the Board's decision. A few days later, Dr. Winston was informed by subsequent letter of the charts reviewed by the relevant committee in making its recommendations and of his right to a hearing before the Judicial Review Committee. By letter of November 15, Dr. Winston informed Mr. John Sielert, executive director of the Hospital, that he withdrew his "pending application for active staff privileges at Twelve Oaks Hospital."

Dr. Winston reapplied to Twelve Oaks in March of 1983. The application was referred to the Hospital's credentials committee for consideration, and it in turn appointed an ad hoc committee to review the medical charts of the patients treated by Dr. Winston in 1982. The ad hoc committee's findings were then presented back to the Hospital's credentials committee, of which Dr. Ronald Norris, a defendant, was a member. The credentials committee voted to recommend denial of Dr. Winston's application.

The executive committee, including Dr. Cumagun and Dr. Jackson, also defendants, next considered the matter. The executive committee accepted the decision of the credentials committee and voted to deny the application. The executive committee notified Dr. Winston by letter dated August 4, 1983, of the decision to deny him medical staff privileges.

Dr. Winston then requested the findings of the executive committee be reviewed by the judicial review committee, a committee of five doctors chaired by Dr. Norborne Powell, also a defendant. The judicial review committee met with Dr. Winston on August 30, 1983, and subsequently voted September 7, 1983, to uphold denial of staff privileges as recommended by the executive committee.

The appellate review committee of the board of directors of the Hospital, which included doctors Norris and Powell, met on October 19, 1983, to consider Dr. Winston's appeal of the judicial review committee's decision. The board reaffirmed the denial of Dr. Winston's request for staff privileges and sent him notice by certified mail dated October 24, 1983.

## II. Dr. Winston's Factual Contentions

Fundamentally, Dr. Winston claims to have uncovered an illicit scheme by certain Twelve Oaks doctors to allocate industrial medicine patients among themselves to his professional and financial injury. The objective of the alleged conspiracy was the suppression of competition which in turn would enhance profits subsequently shared by members of the scheme. Dr. Winston claims they achieved their objective by denying him staff privileges in the Hospital, not because of any lack of professional competence, but in furtherance of their malicious plan.

Plaintiffs allege each defendant doctor would send a list of companies that the doctor claimed were his clients to the emergency room nurses at Twelve Oaks. If an employee from a listed company came to the emergency room, the doctor who claimed a relationship with that company was called. The patients had no knowledge of this alleged arrangement. Dr. Winston says the doctors had no agreements with these companies, and that these companies, in fact, had never even heard of these doctors.

Dr. Winston states Dr. Cumagun, chief of surgery at Twelve Oaks, was appointed to ad hoc physician review committees to remove potential competitors from the staff. Dr. Winston claims he ran afoul of the scheme when he contracted with many of the companies and became a competitor of Dr. Cumagun. Dr. Winston asserts that after he started competing for patients, the Hospital initiated a malicious peer review process against him.

Dr. Winston claims Twelve Oaks did not follow proper procedures in the review and

appeal process according to the Hospital's bylaws. Dr. Winston avers he was not allowed to appear before the ad hoc committee to discuss his medical charts. Further, Dr. Winston says there was no independent review by the credentials or the executive committees, also in violation of hospital bylaws. Although the judicial review committee allowed Dr. Winston to appear, in contrast to other committees, Dr. Winston states he was told he could not be represented by an attorney, even though the sole purpose of the judicial review committee was to ensure that the bylaws were fairly applied.

Dr. Winston asserts he did not learn of the decision of the appellate review committee of the board of directors until November 1983. Dr. Winston also claims corporate counsel for AMI instructed the executive director of Twelve Oaks to alter the minutes of the October 19, 1983, meeting, and that he was unaware of the alleged alteration until after he initiated his federal suit.

Dr. Winston avers that as a result of the denial of his applications for privileges at Twelve Oaks, he cannot get privileges at any other hospital. Due to the damage to his reputation from the events at the Hospital, Dr. Winston states he was unable to obtain staff privileges or admit patients at other hospitals and was forced to close his practice.

He also asserts that in 1984 or 1985, the defendants set up a competing practice in the Galleria area, "The Doctors at the Galleria," and hired his former office manager, who then recruited his former patients.

In summary, Dr. Winston claims that:

1) defendants conspired to "eliminate competition for emergency room patients and to prevent the entry of new physicians into the market at [the Hospital]";

2) he discovered this conspiracy after he obtained his temporary staff privileges;

3) on November 4, 1982, his temporary staff privileges were terminated, and it was recommended that permanent staff privileges be denied because he did not condone the conspiracy;

4) the manner in which his applications for staff privileges were denied, and his temporary staff privileges were terminated, violated the Hospital "bylaws and various contractual agreements between [the Hospital], AMI and [himself]";

5) the denial of staff privileges made it impossible for him to practice medicine, and resulted in his patients going to the Hospital to be treated by defendants;

6) he was unable to obtain "admitting privileges" at other hospitals because of the manner in which he lost his staff privileges at the Hospital;

7) defendants "sought to obtain [his] proprietary information, to confuse [his] patients as to the clinic's identity and to interfere with [his] business relationships by implying that [he] and his clinic had gone out of business";

8) his ex-employee took confidential business information with her when hired by the defendants which was used to, in effect, take over his medical practice; and

9) he discovered the plan to take over his medical practice on January 26, 1987, during a deposition taken during the pendency of the federal lawsuit discussed below.

### III. The Appellees' Factual Contentions

The defendants assert Dr. Winston's initial staff privileges were merely temporary. When Dr. Winston reapplied, the ad hoc committee appointed to evaluate his charts criticized them for: (1) inappropriate evaluation of patients; (2) frequent cases of inadequate and inconsistent medical records; (3) repeated examples of inappropriate surgical judgment; and (4) frequent inappropriate preoperative evaluation of patients. The defendants maintain this was the basis for the denial of Dr. Winston's privileges. They assert a total of 31 doctors on various peer review committees participated in the review of Dr. Winston's charts before his staff privileges were denied on October 19, 1983.

### IV. Procedural History

Dr. Winston initially sued the defendants in federal court in November 1985, seeking

liability under the following statutes and theories:

(1) Sherman Antitrust Act, 15 U.S.C. §§ 1, 15, and 22, and 28 U.S.C. § 1337;

(2) Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, et seq.;

(3) Texas Antitrust laws, TEX. BUS. & COM. CODE ANN. § 15.01 et seq. (Vernon 1987); and

(4) tortious interference with present and prospective contractual and business relationships and prospective advantage.

On May 8, 1990, the federal trial court granted defendants' motion for summary judgment regarding causes of actions pled under the Sherman and RICO acts. Because the only remaining claims were based on state law, the federal court exercised its discretion to dismiss the state claims without prejudice at the time it granted defendants' motion for summary judgment. The federal court clarified by amended order signed July 23, 1990, that its dismissal of the state claims was without prejudice to the state claims being refiled.

Plaintiffs filed suit in state court on July 6, 1990, based on the same facts, asserting the pendent state claims dismissed by the federal court and numerous additional claims. The state suit was based on the following statutes and theories of recovery:

### CAUSES OF ACTION IN FEDERAL SUIT RETAINED

(1) Texas Antitrust laws, TEX. BUS. & COM. CODE ANN. § 15.01 et seq. (Vernon 1987);

(2) tortious interference with present and prospective contractual and business relationships and prospective advantage; and

### CAUSES OF ACTION ADDED IN STATE COURT

(3) fraud;

(4) negligence;

(5) breach of good faith and fair dealing;

(6) promissory estoppel;

(7) defamation and business disparagement;

(8) negligent misrepresentation;

(9) breach of fiduciary duty;

(10) Texas Deceptive Trade Practice Act;

(11) civil conspiracy;

(12) statutory commercial bribery;

(13) unjust enrichment;

(14) ratification; and

(15) breach of contract.

Defendants filed a joint motion for summary judgment on five distinct grounds: (1) the denial of Dr. Winston's staff privileges was not actionable under Texas law regardless of the cause of action asserted; (2) the conduct of the defendant doctors relative to the rejection of Dr. Winston's application for privileges was statutorily privileged; (3) the actions filed were barred by the applicable statute of limitations; (4) the claims were barred by collateral estoppel; and (5) Dr. Winston failed to state necessary elements of the various causes of action pled. The motion was granted in whole by the trial court on August 19, 1991, without stating the specific grounds upon which it was based.

### V. Standard of Review on Appeal from Summary Judgment

Plaintiffs bring five points of error attacking each of the grounds asserted by defendants as a basis for granting of the summary judgment. Accordingly, we will consider the summary judgment evidence in the light most favorable to the nonmovants and indulge every reasonable inference in their favor. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *Holbrook v. Guynes,* 827 S.W.2d 487, 489 (Tex.App.—Houston [1st Dist.] 1992), *aff'd sub nom, Guynes v. Galveston County,* 861 S.W.2d 861 (Tex.1993). We will affirm if any theory in

the summary judgment was meritorious. *Fontenot v. NL Industries,* 877 S.W.2d 339, 340 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Plaintiffs must show that each of the independent grounds alleged in the motion is insufficient to support the order. *Crowder v. Tri–C Resources,* 821 S.W.2d 393, 396 (Tex.App.—Houston [1st Dist.] 1991, no writ).

## VI. The Claims Contained in the Federal Complaint

Although we decide below that the statute of limitations does not bar any claim brought by plaintiffs, we consider the claims asserted in the federal suit apart from the "new" allegations first brought in the state petition.

### a. The State Antitrust Claim

■ Defendants contend plaintiffs are collaterally estopped from maintaining the Texas Antitrust Act claim because the federal court decided the merits of that claim. Collateral estoppel precludes the relitigation of identical issues of fact or law that were already litigated and essential to the judgment in a prior lawsuit where the parties were cast as adversaries. *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex. 1990); *State v. Approximately $2,000,000.00 in United States Currency,* 822 S.W.2d 721, 725 (Tex.App.—Houston [1st Dist.] 1991, no writ). There are three requirements which must be met for the federal doctrine of collateral estoppel to apply to a subsequent, related state court proceeding:

(1) the prior federal decision must have resulted in a judgment on the merits;

(2) the same fact issues sought to be concluded must have been actually litigated in the federal court; and

(3) the disposition of those issues must have been necessary to the outcome of the prior federal litigation.

*Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 843 (Tex.App.—Houston [1st Dist.] 1990, writ denied). When an issue of fact or law is actually

litigated and determined by a valid final judgment, and the determination is essential to the judgment, that determination is conclusive in a subsequent action between the parties, whether on the same or a different cause of action. *See Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex. 1984).

Plaintiffs' Texas Antitrust Act claim is brought under section 15.05(a) of the Texas Antitrust Act. TEX. BUS. & COM.CODE ANN. § 15.05(a) (Vernon 1987). The Texas Supreme Court has noted:

> Section 15.05(a) [of the Texas Antitrust Act] is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). Accordingly, we look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law.

*DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 687 (Tex.1990) (footnote omitted). In addition, section 15.04 of the Texas Antitrust Act provides that its provisions "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes" to an extent consistent with maintaining and promoting economic competition in trade and commerce within Texas. TEX. BUS. & COM.CODE ANN. § 15.04 (Vernon 1987). *See also Red Wing Shoe Co. v. Shearer's, Inc.,* 769 S.W.2d 339, 343 (Tex.App.—Houston [1st Dist.] 1989, no writ) ("[T]he Texas legislature not only used language tracking that of the federal statute ... but it also included a clause [section 15.04] specifying uniformity of construction between the federal and Texas statutes."); *Nafrawi v. Hendrick Medical Ctr.,* 676 F.Supp. 770, 774 (N.D.Tex.1987) ("Establishing a violation of the [Texas Antitrust Act], then, requires the same elements as are required to establish the comparable violation of the Sherman Antitrust Act, 15 U.S.C. § 1.").

■ To establish a violation of section one of the Sherman Antitrust Act or section 15.05(a) of the Texas Antitrust Act, a plaintiff must prove the challenged restraint of trade is unreasonable and has an "adverse effect on

competition" in the relevant market. *DeSantis*, 793 S.W.2d at 688; *see also MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 22–23 (Tex.App.—Dallas 1988, writ denied) ("Without a showing of actual adverse effect on competition, [a plaintiff] cannot make out a case under the antitrust laws.").

■ Here, the federal court considered the merits of plaintiffs' federal antitrust act claim when it granted the motion for summary judgment. In its memorandum opinion, the federal court held that the claim of conspiracy to purloin patient admissions and referrals (1) could not fall under the "per se rule" of illegality, but must be examined under the "rule of reason,"[3] and (2) under the "rule of reason" analysis, it "could not have had an adverse effect on competition" as a matter of law because Twelve Oaks Hospital dealt with a very small share of the patient market.

Plaintiffs advance the same factual allegations as a basis for the Texas Antitrust Act claim as were advanced in the federal antitrust act claim. Accordingly, we conclude the plaintiffs are collaterally estopped from relitigating the state antitrust act claim in state court. We hold the trial court properly granted summary judgment on the state antitrust act claim on the basis of collateral estoppel.

#### b. Tortious Interference

Plaintiffs contend the trial court also committed error in granting summary judgment for defendants regarding the claim against AMI and other defendants for tortious interference with the business relations of Dr. Winston, P.A. and GMC. In their federal complaint, plaintiffs claimed defendants tortiously interfered with their actual and prospective contractual and business relationships, made wrongful use of confidential information, and breached a confidential relationship. The first amended complaint filed in federal court alleged AMI used bribes and illegal inducements to establish a physician group, defendants sought and did obtain Dr. Winston's proprietary information, confused Dr. Winston's patients as to the identity of this physician group, and implied that Dr. Winston and GMC had gone out of business.

The original petition filed in state court alleged that AMI used bribes, and other illegal inducements to establish a physician group in the Galleria, and "this group sought to obtain Dr. Winston's proprietary information, to confuse Dr. Winston's patients as to their identity, and to interfere with Dr. Winston's business relationship by implying that Dr. Winston and his clinic had gone out of business." The second amended petition filed in state court more specifically alleged that in the summer of 1984, AMI hired Dr. Winston's GMC office manager, Nelda Barrera, to assist in establishing its medical office at The Doctors at the Galleria. The petition also states that when Barrera left to work for defendants, she took Dr. Winston's rolodex, confidential information concerning price lists and fee agreements, and the names of Dr. Winston's patients. In response to the defendants' motion for summary judgment, plaintiffs submitted Dr. Winston's affidavit setting out these allegations.

The state court summary judgment record also includes excerpts of deposition testimony from Randy Winograd, the head of AMI's physician relations department. The Doctors at the Galleria was funded by AMI. Winograd stated he was involved in recruiting Barrera to work at The Doctors at the Galleria and knew she was working for Dr. Winston at GMC at that time. Winograd also stated he did not ask Barrera to bring patient lists from GMC and Barrera told him she would not consider bringing confidential information to AMI if she was hired by The Doctors at the Galleria. Barrera was hired as office manager for The Doctors at the Galleria.

3. *See National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 688–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978), for an analysis of the distinction between these types of trade restraints.

Excerpts from the deposition of Patricia Claiborne, another employee of GMC, also appear in the record. Claiborne stated Barrera told her she had been hired to work at The Doctors at the Galleria. Claiborne also stated she saw Barrera take the rolodex with names of contact persons, price lists, vendor lists, and other information from GMC, and Barrera told her she was taking such items so that when she left GMC, she would have "everything she needed." Claiborne further stated that after The Doctors at the Galleria opened, patients would arrive at GMC with forms from the other clinic, unaware they were at the wrong clinic.

▆▆▆ The elements of a cause of action for tortious interference with contractual relations are: (1) there was a contract subject to interference; (2) the act of interference was willful and intentional; (3) such intentional act was a proximate cause of a plaintiff's damages; and (4) actual damage or loss occurred. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 175 (Tex. App.—Houston [1st Dist.] 1992, writ denied). Texas law protects existing and prospective contracts from interference. *Davis,* 848 S.W.2d at 175.

▆▆▆ Interference with a business relationship is similar to the tort of contract interference. It is not necessary to establish the existence of a valid contract, but interference with a general business relationship is actionable only if a defendant's interference is motivated by malice. *CF & I Steel Corp. v. Pete Sublett & Co.,* 623 S.W.2d 709, 715 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). To recover on a cause of action for tortious interference with a *prospective* business relationship, a plaintiff must show: (1) there was a reasonable probability he would have entered into a business relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified in his actions; and (4) actual harm or damage occurred to the plaintiff as a result. *American Medical Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 337 (Tex. App.—Houston [14th Dist.] 1991, no writ).

In their motion for summary judgment, defendants argue plaintiffs' claim of tortious interference against AMI is barred by limitations. We disagree. The tortious interference claims against defendants are alleged to have arisen in 1984, when defendants established its clinic and hired Barrera. The plaintiffs filed their federal complaint in 1985, within the two-year limitations period. Although the plaintiffs do not specify the business relationships or actual or prospective contracts of GMC and Dr. Winston, P.A. that were subjected to interference by defendants, such is not their burden to defeat a motion for summary judgment based on limitations. The defendants argued all the plaintiffs' causes of action accrued in October 1983, when Dr. Winston's staff privileges were denied, and so did not present argument or summary judgment evidence sufficient to defeat the claims against defendants for their actions in 1984 as a matter of law. Because of the tolling provisions discussed below, we determine that the trial court could not have properly granted summary judgment on the basis of limitations as to the tortious interference causes of action originally pled in the federal suit.

### VII. Statute of Limitations

Next, we consider the question of whether the trial court could have correctly granted summary judgment in part because a portion of the remainder of Dr. Winston's claims were filed outside the applicable statutes of limitations.

Dr. Winston reapplied for staff privileges at Twelve Oaks in March of 1983. He was sent formal notification of the Hospital's denial of his reapplication by certified mail on or about October 25, 1983, however, there was evidence he did not receive the notice until mid-November, 1983. The federal lawsuit was filed on November 4, 1985, and the amended order of dismissal was signed July 23, 1990. The state court lawsuit was filed July 6, 1990.

Notwithstanding that the state lawsuit was filed nearly seven years after the events that predicated Dr. Winston's complaints, plaintiffs argue that the respective statutes of limitations were tolled while their case was pending in federal court, based on TEX. CIV. PRAC. & REM.CODE ANN. § 16.064 (Vernon 1986). Plaintiffs further claim that they could add additional causes of action that were not included in their federal lawsuit pursuant to TEX. CIV. PRAC. & REM.CODE ANN. § 16.068 (Vernon 1986), provided that any new theories of recovery were based on the same facts alleged as a basis for the federal suit.

Defendants respond by arguing that (1) plaintiffs have not complied with the procedural requirements of 16.064; (2) that in any event, plaintiffs could not "save" any causes of action other than those specifically pled in the federal suit; and (3) that certain of the state law claims now pled were barred by the relevant statute of limitations before the federal suit was filed. TEX. CIV. PRAC. & REM. CODE ANN. § 16.064 (Vernon 1986), provides in part:

> (a) The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:
>
> (1) because of lack of jurisdiction in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and
>
> (2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.

### a.  Procedural Requirements of 16.064

■ Defendants first note plaintiffs filed the state suit (July 6, 1990) before the federal

dismissal became final (July 20, 1990) and thus violated section (a)(2). Defendants argue the statute requires that the state suit can only be filed in a window of 60 days after the federal suit becomes final. Therefore, the defendants claim the state suit was filed too soon to take advantage of the statute. Finally, defendants state that Dr. Winston's construction of the statute "would encourage the filing of a second suit *anytime* during the pendency of the first suit and lead to an undesirable deluge of simultaneous parallel state and federal litigation." (Emphasis in original.)

■ However, under the facts of this case, we disagree. Here, the state suit was not filed at anytime, but only after a putative final judgment was signed on May 8, 1990, in the federal case. The tolling provisions are remedial in nature and are to be liberally construed. *Vale v. Ryan,* 809 S.W.2d 324, 326 (Tex.App.—Austin 1991, no writ.). Although defendants are correct that the precise question before us was not answered in the *Vale* opinion, we do not find the construction of the language in the statute urged on us by defendants independently persuasive, nor consistent with the many cases mandating a liberal construction of the statute. Further, we do not find the filing of the state suit in this case so premature, if it was so filed, as to be devoid of any meaningful relationship with the signing of the final judgment. Accordingly, we do not find the trial judge could have granted the summary judgment because of the plaintiffs' alleged failure to comply with the procedural requirements of 16.064.[4]

### b.  "Saving" statute

Next, defendants argue that if the state suit was filed consistent with the timeliness requirements of the statute, the only causes of action that can be saved are the ones asserted in the federal suit. Defendants

---

4. Defendants also urge our consideration of *Gutierrez v. Lee,* 812 S.W.2d 388, 392 (Tex.App.—Austin 1991, writ denied). In *Gutierrez,* the Austin Court found 16.064 inapplicable to the facts of the case before it for substantive reasons. We are not bound by the court's suggestion of how 16.064 would have been unhelpful to the Lees even if it did apply.

state that the "same action" language of 16.064(a) limits what plaintiffs can file in the state court to exactly what was filed in the federal court. If defendants are correct, then plaintiffs would have a state suit under the Texas Antitrust laws and for tortious interference with present and prospective contractual and business relationships. The remaining causes of action contained in plaintiffs' state pleadings would have been properly dismissed by the trial judge.

Plaintiffs argue that TEX. CIV. PRAC. & REM. CODE ANN. § 16.068 (Vernon 1986) allows Dr. Winston to add additional theories of recovery if the new claims are not grounded in new, distinct, or different transactions or occurrences. Defendants present us with no Texas authority that prohibits litigants from taking advantage of the amending provisions of 16.068 to causes of action saved under 16.064. Defendants do cite us to authority from other states construing statutes similar to 16.064, but not to any authority involving the interaction between statutes like 16.064 and 16.068.

■ We find that sections 16.064 and 16.068 should be interpreted together so as to achieve the clear purpose of the statutes, which is to toll limitations for a certain period when a case is dismissed for lack of jurisdiction and to allow adding to a petition additional theories of liability or defenses after the lawsuit has been filed if those new theories or defenses are not wholly based on a new, distinct, or different transaction or occurrence. Accordingly, we hold the trial judge could not have granted the summary judgment and eliminated the "new" causes of action pled based on the inapplicability of 16.068 to causes of action "saved" under 16.064.

#### c. Claims Barred before Federal Suit Filed

■ When summary judgment is sought on the ground that limitations has expired, it is the movant's burden to conclusively establish the limitations bar, including the negation of a tolling or suspension statute raised by the nonmovant. *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex.1975); *Ardila v. Saavedra*, 808 S.W.2d 645, 647 (Tex. App.—Corpus Christi 1991, no writ). Dr. Winston pled in his second amended petition that "the individual Defendants were absent from the state for several days during the two years following the denial of staff privileges; thereby, tolling the statute of limitations on the tort claims."

■ The absence from this state of a person against whom a cause of action may be maintained suspends the running of the applicable statute of limitations for the period of the person's absence. TEX. CIV. PRAC. & REM.CODE ANN. § 16.063 (Vernon 1986); *Ardila*, 808 S.W.2d at 646; *Hooper v. Torres*, 790 S.W.2d 757, 758–59 (Tex.App.—El Paso 1990, writ denied). Because defendants moved for summary judgment, it was their burden to conclusively negate Dr. Winston's reliance on 16.063 and prove the individual defendants were not out of the state as alleged. *Ardila*, 808 S.W.2d at 647. We find no evidence in the record from the defendants on this issue; thus, the defendants have failed to carry their burden. Therefore, we conclude the trial judge could not have granted summary judgment based on the running of any statute of limitations.[5]

We note that both sides to the litigation have discussed the statute of limitations issue in the context of a suit "for denial of staff privileges." The parties generally agree that the cause of action accrued sometime between late October and late November of 1983 with the receipt by Dr. Winston of the final denial letter sent to him by Sielert, the Hospital's chief administrator. The parties dispute the precise date on which Dr. Winston received the letter. We do not decide whether an accrual date can be determined as a matter of law because plaintiffs pled a

---

5. Because we resolve the case as to all parties later in the opinion with regard to the causes of action arising from the denial of Dr. Winston's application for staff privileges, it is unnecessary here to distinguish between the corporate and individual defendants relative to application of the tolling statute. Obviously, the corporate defendant had not left the state.

tolling statute, which brings into issue when the limitations period ended as distinguished from when it started. Because we cannot determine as a matter of law on what day limitations ran, it is not necessary for the resolution of the limitations questions presented to address or resolve on what day it started.[6]

### VIII. Private Hospital Action

■ The first grounds for summary judgment urged by the defendants was that in 1982 and 1983, the denial of staff privileges at a *private hospital* was not actionable under Texas law, regardless of the cause of action asserted. It is uncontroverted that Twelve Oaks Hospital is a *private* hospital. Numerous Texas cases have drawn a distinction between private and public hospitals, consistently holding that the decision of a governing board of a private hospital with regard to staff privileges is not subject to judicial review. *Armintor v. Community Hosp. of Brazosport,* 659 S.W.2d 86, 88–89 (Tex.App.—Houston [14th Dist.] 1983, no writ); *Tigua Gen. Hosp. v. Feuerberg,* 645 S.W.2d 575, 578 (Tex.App.—El Paso 1982, writ dism'd w.o.j.); *Hodges v. Arlington Neuropsychiatric Ctr., Inc.,* 628 S.W.2d 536, 538 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.); *Charter Medical Corp. v. Miller,* 605 S.W.2d 943, 951 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). *See also Grossling v. Ford Memorial Hosp.,* 614 F.Supp. 1051, 1058 (E.D.Tex.1985). The court in *Tigua* stated the controlling principles as follows:

> Where a hospital excludes or discriminates against a physician or surgeon applying for or seeking to maintain staff membership, the subsequent treatment of the problem by the courts depends primarily upon whether the hospital involved is a public or private institution and it is generally held that a private hospital acts at its own discretion and that its decisions are not

subject to judicial review.... Texas follows the rule that the exclusion of a physician from staff privileges is a matter which ordinarily rests with the discretion of the management authorities and is not subject to judicial review. In summary, in the area of private hospitals those cases have held that the doctor in this State has no cause of action against a private hospital for the termination of staff privileges even where the action of the hospital was arbitrary and capricious or where common law rights to procedural or substantive due process were violated. In this situation, the final authority to terminate a doctor-staff privilege rests with the Board of Governors.

645 S.W.2d at 578 (citations omitted).

We agree with defendants that at the relevant time, 1982–1983, Texas law did not permit recovery by a physician against a private hospital or its staff for denial or termination of physician staff privileges, regardless of the name given to the cause of action. Dr. Winston has not cited to this court a single Texas decision to the contrary, and we have found none.

Accordingly, we affirm the summary judgment against Dr. Winston as to all of his causes of action based on certain defendants' denial of Dr. Winston's application for staff privileges and the termination of his temporary privileges.

We reverse the summary judgment as to Dr. Winston's claim of tortious interference with present and prospective contractual and business relationships based on defendants' establishment of a competing practice in the Galleria area, and we remand that portion of the case to the trial court.

---

6. We note that under Dr. Winston's theory of the case, the denial of staff privileges was not an end in itself, but evidence of a broader illegal objective, the taking of his medical business. We have not been asked to discuss other acts allegedly taken in furtherance of the alleged conspiracy, such as the hiring of Dr. Winston's office manager, as they might impact our consideration of the limitations issues.